AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

**SEP 0 6 2017**

CLERK U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Sixteen Electronic Devices Seized From Persons
Charged in Southern District of California
Case Number 17CR2538-BAS

)
)
)
)
)
)

Case No.    **'17 MJ3229**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 922, 924, 1956, 1957; 21 USC §§ 841, 846 | Unlawful possession of firearms, money laundering, drug distribution |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Paul Geering, Special Agent, Internal Revenue Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **9/6/2017**

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

**ANDREW G. SCHOPLER
U.S. MAGISTRATE JUDGE**

1 **AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

2 I, Paul Geering, Special Agent, Internal Revenue Service - Criminal
3 Investigation, being duly sworn, hereby state:

**A.     Training and Experience**

5 I am a Special Agent of the Internal Revenue Service, Criminal Investigation,
6 assigned to the San Diego, California post of duty, and have been a special agent for
7 twenty-one years. I am a graduate of San Diego State University where I received a
8 Bachelor of Science degree in Criminal Justice Administration. Additionally, I
9 graduated from the Federal Law Enforcement Training Center where I received
10 training in, among other things, areas such as investigation techniques, tax law,
11 criminal tax violations, money laundering violations, and familiarization with
12 controlled substances. During my employment with the Internal Revenue Service,
13 Criminal Investigation, I have conducted and participated in criminal investigations of
14 individuals and businesses who have violated federal laws, particularly those found in
15 Title 18, Title 21, Title 26, and Title 31 of the United States Code. I have also
16 participated in the execution of search and seizure warrants on private residences,
17 businesses, professional offices, safe deposit boxes, bank accounts and vehicles.

18 By virtue of my employment as a Special Agent, I have performed various tasks,
19 which include, but are not limited to:

20   1.   Functioning as a surveillance agent and thereby observing and recording
21        movements of persons trafficking in illegal drugs and weapons and
22        laundering money;

23   2.   Functioning as an undercover agent;

24   3.   Functioning as a case agent, which involves the supervision of specific
25        investigations involving drug traffickers and money launderers;

26   4.   Participating in the tracing of monies and assets gained by drug traffickers
27        from illegal sale of drugs; and

28   5.   Interviewing witnesses and informants relative to the illegal trafficking of
29        drugs and distribution of monies and assets derived from the illegal
30        trafficking of drugs.

1    Based on my experience, I am also familiar with the methods utilized in drug

2    trafficking operations. This investigation has been conducted in cooperation with the

3    Drug Enforcement Administration and Homeland Security Investigations, and I have

4    spoken and coordinated with those agencies about the facts herein.

**B.     Purpose of This Affidavit**

6    I submit this affidavit in support of an application for a warrant to conduct

7    searches of the digital contents of sixteen electronic devices seized on August 17, 2017

8    from persons charged in Southern District of California Case Number 17CR2538-BAS

9    and more specifically described in Attachment A, incorporated herein by reference.

10   Based on my training and experience, and the facts set forth below, I believe the items

11   described in Attachment B, incorporated herein by reference, are likely to be found on

12   the target devices.

**C.     Investigative Background**

14   In October 2015, I learned of suspicious activity occurring in bank accounts

15   associated with a banking customer who had provided the address of 2330 Grove Ave.

16   # 14, San Diego, CA 92154, when opening the accounts. On January 29, 2016, I

17   conducted surveillance at that location and observed a Hispanic male depart in a black

18   Honda Ridgeline (CA 21223U1). I followed the Ridgeline to another residence located at

19   594 Race Point Ct., Chula Vista, CA 91911, and observed numerous other vehicles

20   parked around that residence, including a red Ford F-150 truck (CA 57341W1)

21   registered to Gabriela F. NUNEZ. Agents then conducted Financial Crimes

22   Enforcement Network ("FinCEN") queries for any accounts associated with those two

23   residence addresses, as well as any accounts associated with the names and/or

24   addresses of the registered owners of the vehicles observed during surveillance.

25   As additional associated accounts were located, agents expanded the queries to

26   include any accounts with matching account holder names, addresses, phone numbers,

27   e-mail addresses, etc. Subpoenaed records for these accounts revealed that over 50 of

28   these accounts were being used as "funnel accounts," that is, accounts used to receive

29   cash deposits up to $10,000 from locations distant from San Diego, which were then

30   quickly withdrawn in the San Diego area. Based on my training and experience, I know

1  that this is a common practice used among drug traffickers to transmit drug proceeds
2  from distributors throughout the United States back to San Diego and other border
3  cities. The currency, once withdrawn in San Diego, can then be smuggled in bulk into
4  Mexico to the drug suppliers, thereby avoiding the scrutiny that large cash transactions
5  generate in the United States. In aggregate, the funnel accounts identified as being
6  associated with this particular conspiracy due to their common personal identifying
7  information have been used to transmit over $5 million.

8       On March 3, 2016, San Diego County Sheriff's deputies stopped the Ridgeline
9  near 1750 Oro Vista Road, San Diego. The driver and sole occupant was identified as
10 William QUINTERO. QUINTERO consented to a search of the Ridgeline, which yielded
11 a white box containing $21,000 in currency. A subsequent search of the residence of
12 QUINTERO and his wife, Arami, at 2330 Grove Ave. yielded an additional $40,550 in
13 currency and 2317.5 pounds of marijuana. On March 4, 2016, officers executed a search
14 warrant at Hilltop Main Self-Storage, 3755 Main Street, Chula Vista, CA, Unit G005,
15 which was rented to William QUINTERO. The storage unit contained an additional
16 3619.7 pounds of marijuana. William and Arami QUINTERO both subsequently pled
17 guilty to Title 21 offenses in Southern District of California Case Number 16CR0691-
18 BAS.

19      Incident to William QUINTERO's arrest, agents seized his cellular phone and
20 obtained a warrant to search it. During a search of the phone, agents found data that
21 aided in the identification of Javier FELIX-Bayardo and Mario NORIEGA-Osuna as
22 criminal associates of William QUINTERO. FELIX-Bayardo is married to NUNEZ, the
23 registered owner of the red Ford F-150 that was previously observed outside 594 Race
24 Point Ct., an address associated with multiple funnel accounts.

25                **D.    Money Laundering Activity**

26      As mentioned above, agents identified a set of accounts at Bank of America and
27 Wells Fargo that shared common account identifiers, such as the owner's name, mailing
28 address, phone number, and/or email address. Agents subpoenaed records for each of
29 these accounts, including bank statements as well as the documentation of the opening
30 of the accounts. Agents discovered that FELIX-Bayardo and Mario NORIEGA-Osuna

controlled many of these accounts, either in their own names or under aliases. When opening accounts under aliases, FELIX-Bayardo and NORIEGA-Osuna often presented an identification document purportedly issued by the Mexican government that contained their photo but another person's name. In other instances, agents reviewed bank or ATM surveillance footage showing FELIX-Bayardo and NORIEGA-Osuna making withdrawals from the alias accounts. Based on that information, the following charts set forth the accounts believed to be opened and controlled by FELIX-Bayardo and NORIEGA-Osuna:

| Account Name | Account | Statement Date Range | Cash Deposit Amount |
|---|---|---|---|
| Javier Felix-Bayardo | BOA #2275<br>WFB #8371 | 1/13/14 – 6/18/14<br>9/8/15 – 1/21/16 | $75,290<br>$103,045 |
| Saul Barragan-Soto | BOA #4440<br>WFB #2123 | 1/13/16 – 1/12/17<br>12/30/15 – 1/24/17 | $114,155<br>$214,786 |
| Javier Felix-Loya | BOA #4789<br>WFB #3144 | 4/6/16 – 1/25/17<br>2/1/16 – 6/13/16 | $125,479<br>$59,751 |
| Javier Lopez-Perez | BOA #2070<br>WFB #0247 | 3/5/15 – 8/17/15<br>3/5/15 – 11/24/15 | $120,620<br>$108,400 |
| Alfredo Pina-Gil | BOA #2397<br>WFB #1198 | 1/22/15 – 7/20/15<br>1/20/15 – 3/10/16 | $232,460<br>$364,040 |
| Jesus Guerra-Lopez | BOA #7093 | 8/24/15 – 1/4/16 | $138,892 |
| Manuel Gomez-Acosta | BOA #6272<br>WFB #7768 | 12/28/15 – 5/19/17<br>12/30/15 – 2/28/17 | $89,760<br>$127,532 |
| Cesar Rangel | WFB #2168 | 8/12/15 – 1/26/16 | $162,639 |
| Raul Bustamante-Nieto | BOA #5875<br>WFB #6804 | 8/14/14 – 12/18/15<br>8/18/14 – 3/16/16 | $223,040<br>$367,526 |
| **FELIX-Bayardo Total** | | | **$2,627,415** |

| Account Name | Account | Statement Date Range | Cash Deposit Amount |
|---|---|---|---|
| Mario Noriega | WFB #5429<br>WFB #9042 | 2/18/14 – 7/30/14<br>12/7/15 – 1/30/14 | $123,750<br>$7,000 |
| Mario Osuna-Felix | WFB #8998 | 6/27/16 – 2/27/17 | $47,359 |
| Martin Gonzales-Cota | BOA #0613<br>WFB #2115 | 12/30/15 – 12/7/16<br>12/30/15 – 3/2/16 | $40,250<br>$46,951 |
| Jose Lara-Osuna | WFB #7082 | 2/5/16 – 3/2/16 | $17,500 |
| Julio Prado-Cruz | BOA #0906<br>WFB #6195 | 12/31/15 – 4/25/16<br>12/31/15 – 3/3/16 | $45,460<br>$37,000 |

| Pedro Loya-Osuna | WFB #2680 | 8/11/15 – 4/1/16 | $100,410 |
|---|---|---|---|
| Pedro Iribe-Cota | WFB #2314 | 8/10/16 – 1/31/17 | $36,050 |
| Manuel Felix-Lara | BOA #1776 | 9/8/15 – 1/5/16 | $70,522 |
| | WFB #1625 | 9/8/15 – 12/9/15 | $59,450 |
| | WFB #3515 | 12/9/15 – 3/3/16 | $25,300 |
| Ivan Noriega-Bayardo | WFB #4835 | 7/20/16 – 9/22/16 | $36,900 |
| Ricardo Sandoval-Picos | BOA #2617 | 12/11/15 – 4/25/16 | $52,875 |
| | WFB #6687 | 10/14/15 – 3/2/16 | $66,330 |
| Jose Toloza-Nieto | BOA #6088 | 8/27/15 – 12/14/15 | $76,622 |
| | WFB #3420 | 8/27/15 – 12/14/15 | $100,150 |
| Daniel Ortega-Cruz | WFB #1800 | 4/5/16 – 12/29/16 | $72,025 |
| Miguel Sandoval-Osuna | WFB #7857 | 4/5/16 – 1/13/17 | $69,202 |
| Luis Lopez-Torres | WFB #3919 | 1/15/15 – 10/8/15 | $126,600 |
| Luis Castro-Cruz | WFB #4429 | 8/10/16 – 1/30/17 | $43,090 |
| Victor Perez-Loya | WFB #5585 | 8/16/16 – 2/16/17 | $42,687 |
| **NORIEGA-Osuna Total** | | | **$1,343,483** |

From June 2015 to June 2017, there were deposits totaling approximately $101,630.80 into NUNEZ's Mission Federal Credit Union account, including cash deposits of $59,587 and checks or money orders of $18,100 from the accounts of FELIX-Bayardo and several of his aliases. The withdrawals from the Mission Federal account were used for gambling, personal living expenses, water and utility bills, car insurance, a monthly rent payment of $2650 for NUNEZ and FELIX-Bayardo's residence at 3671 Royal Place, Bonita, CA, a monthly lease payment of $1260 for NUNEZ's 2016 Mercedes-Benz GLE 450, and car loan payments of $1002.75 for NUNEZ's 2015 Dodge Durango. Despite extensive surveillance, agents have not observed FELIX-Bayardo or NUNEZ going to work, conducting a legitimate business, or otherwise earning any legitimate income. FELIX-Bayardo is a citizen of Mexico without authorization to be present or work in the United States. While NUNEZ is a citizen of the United States, she has no known employment and receives various public benefits including Medi-Cal (low-income healthcare program) and CalFresh (low-income food assistance). I therefore believe that FELIX-Bayardo transmitted illicit funds to NUNEZ's Mission Federal

1  account to be used to pay their joint household expenses. In addition, on at least six

2  occasions, NUNEZ personally withdrew currency from funnel accounts operated by

3  FELIX-Bayardo. For example, FELIX-Bayardo maintained Wells Fargo account #

4  8789652123 under the alias Saul Barragan-Soto. On January 4, 2017 NUNEZ's photo

5  was taken at a drive-through ATM machine in Chula Vista, CA as she withdrew $300

6  from the Barragan-Soto account while driving the 2015 Dodge Durango.

## E.    Drug Distribution Activity

8        On February 24, 2017, an agent conducting surveillance observed Rigoberto

9  MUNOZ-Banuelos depart FELIX-Bayardo and NUNEZ's residence and drive to the

10  Acropolis Space Center self-storage facility in National City, CA. A review of Acropolis

11  Space Center records revealed that two units were associated with FELIX-Bayardo:

12  Unit 101118 and Unit 101119. Unit 101118 was rented under the name "Javier Felix-

13  Loya," who had provided Mexican passport number G10935774 when renting the unit.

14  The photograph on the passport depicted FELIX-Bayardo. Unit 101119 is directly

15  adjacent to Unit 101118. Unit 101119 was rented under the name "Raul C. Martinez,"

16  who had provided Mexican passport number F7411528 when renting the unit. The

17  photograph on the passport depicted MUNOZ-Banuelos.

18        From February 24, 2017 through August 8, 2017, FELIX-Bayardo, MUNOZ-

19  Banuelos, Manuel FELIX-Gutierrez, Hector SANDOVAL-Toloza, and other identified

20  and unidentified males were observed in surveillance footage accessing Units 101118

21  and/or 101119 at Acropolis Space Center 22 or more times, in aggregate. During these

22  trips, these individuals could be seen delivering and/or removing cardboard boxes,

23  plastic containers, bags, and buckets to and from the units. For example, on June 12,

24  2017, FELIX-Bayardo and two other individuals accessed Unit 101119 and removed two

25  boxes and a large bag.

26        On the morning of August 9, 2017, agents executed a search warrant on Units

27  101118 and 101119. Agents seized: (1) approximately 26.5 kilograms of a substance that

28  field-tested positive for the properties of cocaine; (2) approximately 938 grams of a

29  substance that field-tested positive for the properties of methamphetamine; (3)

30  approximately 486 kilograms of a substance that field-tested positive for the properties

1 of marijuana; and (4) multiple firearms including a .223 caliber fully automatic rifle, a

2 .45 caliber revolver, two 9mm semi-automatic pistols, and a .45 caliber semi-automatic

3 pistol. Below is an image of the items seized from units 101118 and 101119:



19 **F.      Arrests of Defendants and Seizure of Subject Devices**

20         On August 16, 2017, Magistrate Judge Nita L. Stormes, Southern District of

21 California, issued, inter alia, warrants for the arrests of FELIX-Bayardo, NUNEZ,

22 NORIEGA-Osuna, FELIX-Gutierrez, and SANDOVAL-Toloza, pursuant to a criminal

23 complaint. Judge Stormes also issued search warrants for the residence at 3761 Royal

24 Place in Bonita, as well as an outbuilding structure on a rural property in Alpine, CA

25 frequented by FELIX-Bayardo. On the morning of August 17, 2017, agents executed the

26 arrest and search warrants. NUNEZ and SANDOVAL-Toloza were arrested inside 3761

27 Royal Place, FELIX-Bayardo and FELIX-Gutierrez were arrested after attempting to

28 flee from the Alpine structure, and NORIEGA-Osuna was arrested at his job site in San

29 Diego. While executing the arrests and searches, agents located all of the subject devices

30 in the following locations:

1      Device 1: In the outbuilding structure in Alpine

2      Device 2: In a small black bag that FELIX-Bayardo attempted to discard while

3      fleeing

4      Device 3: On FELIX-Bayardo at time of arrest

5      Device 4: In a bedroom at the Royal Place residence that was neither the apparent

6      master bedroom nor a child's bedroom

7      Device 5: In the kitchen/dining area at the Royal Place residence

8      Device 6: In the kitchen/dining area at the Royal Place residence

9      Device 7: In the kitchen/dining area at the Royal Place residence

10     Device 8: In the apparent master bedroom at the Royal Place residence

11     Device 9: In the living room at the Royal Place residence

12     Device 10: In the apparent master bedroom at the Royal Place residence

13     Device 11: In a bedroom at the Royal Place residence that was neither the

14     apparent master bedroom nor a child's bedroom

15     Device 12:   In a bedroom at the Royal Place residence that was neither the

16     apparent master bedroom nor a child's bedroom

17     Device 13: On either, FELIX-Bayardo, FELIX-Gutierrez, or SANDOVAL-Toloza

18     at time of arrest

19     Device 14: On either, FELIX-Bayardo, FELIX-Gutierrez, or SANDOVAL-Toloza

20     at time of arrest

21     Device 15: On FELIX-Bayardo at time of arrest

22     Device 16: On NORIEGA-Osuna at time of arrest

23         The search warrants contemplated that any electronic devices located at the

24     subject locations could be seized, but their contents not searched absent a subsequent

25     warrant. This application follows.

26     **G.     Use of Electronic Devices in Furtherance of Criminal Activity**

27         As a general matter, drug traffickers and money launderers use cellular

28     telephones because they are mobile and they provide instant access to telephone calls,

29     text, web, and voice messages. In addition, the following instances support my belief

30     that the defendants from whom the target devices were seized routinely used electronic

1   devices in furtherance of the charged offenses and that the evidence described in
2   Attachment B is therefore likely to be found on the devices listed in Attachment A:

3        1.     As discussed above, a search of William QUINTERO's cellular telephone
4   assisted in the initial identification of FELIX-Bayardo and NORIEGA-Osuna as co-
5   conspirators. QUINTERO's telephone contained evidence of communications with co-
6   conspirators as well as other relevant data, for example, a video clip depicting FELIX-
7   Bayardo in possession of numerous firearms.

8        2.     Laundering drug proceeds through funnel accounts requires coordination
9   among co-conspirators in different geographic locations. In this case, currency would be
10  deposited in locations around the country and almost immediately withdrawn in the
11  San Diego area, often the same day. This likely required communication between those
12  responsible for the deposits and those responsible for the withdrawals, which almost
13  certainly occurred via some service accessible through cellular telephones, like a voice
14  call, text message, e-mail, or third-party application. In addition, I know that major
15  banks like Bank of America and Wells Fargo offer proprietary applications for cellular
16  telephones that allow customers to access their accounts from their mobile devices.

17       3.     In this case, agents have identified numerous e-mail addresses associated
18  with the bank accounts that were used as funnel accounts. Cellular telephones, tablet
19  devices, and computers all provide access to e-mail, which may include the e-mail
20  accounts associated with the funnel accounts in this case.

21       4.     After the defendants were arrested, there was incoming call and message
22  activity on their cellular telephones that was plainly visible to agents who possessed,
23  but did not access, the phones, including communications from a contact name that is
24  an identified co-conspirator in this case.

25       5.     As discussed above, there is evidence that multiple defendants possessed
26  numerous falsified identification documents in names other than their own. At this
27  time, the origin of those documents is unknown. However, I know that preparation of
28  such documents likely requires the use of digital photographs and graphic design
29  software, which may be found on computers or storage drives. If any of the defendants
30

1 were themselves responsible for the creation of the falsified identification documents, it

2 is likely that evidence of that process may be found on their electronic devices.

3 **H.   Search Protocol**

4    With the approval of the Court in signing this warrant, agents executing the

5 warrant will employ the following procedures when searching the subject devices:

6 Cellular Telephones

7    It is not possible to determine, merely by knowing a cellular telephone's make,

8 model and serial number, the nature and types of services to which the device is

9 subscribed and the nature of the data stored on the device. Cellular devices today can

10 be simple cellular telephones and text message devices, can include cameras, can serve

11 as personal digital assistants and have functions such as calendars and full address

12 books and can be mini-computers allowing for electronic mail services, web services and

13 rudimentary word processing. An increasing number of cellular service providers now

14 allow for their subscribers to access their device over the internet and remotely destroy

15 all of the data contained on the device. For that reason, the device may only be powered

16 in a secure environment or, if possible, started in "flight mode" which disables access to

17 the network. Unlike typical computers, many cellular telephones do not have hard

18 drives or hard drive equivalents and store information in volatile memory within the

19 device or in memory cards inserted into the device. Current technology provides some

20 solutions for acquiring some of the data stored in some cellular telephone models using

21 forensic hardware and software. Even if some of the stored information on the device

22 may be acquired forensically, not all of the data subject to seizure may be so acquired.

23 For devices that are not subject to forensic data acquisition or that have potentially

24 relevant data stored that is not subject to such acquisition, the examiner must examine

25 the device manually and record the process and the results using digital photography.

26 This process is time and labor intensive and may take weeks or longer.

27    Following the issuance of this warrant, I will collect the cellular-capable devices

28 and subject them to analysis, with assistance if necessary from cellular telephone

29 forensic examiners. All forensic analysis of the data contained within the telephones

30

1   and their memory cards will employ search protocols directed exclusively to the

2   identification and extraction of data within the scope of this warrant.

3          Based on the foregoing, identifying and extracting data subject to seizure

4   pursuant to this warrant may require a range of data analysis techniques, including

5   manual review, and, consequently, may take weeks or months. The personnel

6   conducting the identification and extraction of data will complete the analysis within

7   ninety (90) days, absent further application to this court.

8                               Non-Cellular Devices

9          After obtaining a forensic image, the data will be analyzed to identify and extract

10  evidence subject to seizure pursuant to this warrant. Analysis of the data following the

11  creation of the forensic image can be a highly technical process requiring specific

12  expertise, equipment and software. There are thousands of different hardware items

13  and software programs, and different versions of the same programs, that can be

14  commercially purchased, installed, and custom-configured on a user's computer system.

15  Computers are easily customized by their users. Even apparently identical computers

16  in an office or home environment can be different with respect to configuration,

17  including permissions and access rights, passwords, data storage, and security. It is not

18  unusual for a computer forensic examiner to have to obtain specialized hardware or

19  software, and train with it, in order to view and analyze imaged data.

20         Analyzing the contents of a computer or other electronic storage device, even

21  without significant technical challenges, can be very challenging. Searching by

22  keywords, for example, often yields many thousands of hits, each of which must be

23  reviewed in its context by the examiner to determine whether the data is within the

24  scope of the warrant. Merely finding a relevant hit does not end the review process for

25  several reasons. The computer may have stored metadata and other information about

26  a relevant electronic record – e.g., who created it, when and how it was created or

27  downloaded or copied, when it was last accessed, when it was last modified, when it was

28  last printed, and when it was deleted. Keyword searches may also fail to discover

29  relevant electronic records, depending on how the records were created, stored, or used.

30  For example, keywords search text, but many common electronic mail, database, and

1   spreadsheet applications do not store data as searchable text. Instead, the data is saved
2   in a proprietary non-text format. Documents printed by the computer, even if the
3   document was never saved to the hard drive, are recoverable by forensic programs
4   because the printed document is stored as a graphic image. Graphic images, unlike text,
5   are not subject to keyword searches. Similarly, faxes sent to the computer are stored as
6   graphic images and not as text. In addition, a particular relevant piece of data does not
7   exist in a vacuum. To determine who created, modified, copied, downloaded,
8   transferred, communicated about, deleted, or printed the data requires a search of other
9   events that occurred on the computer in the time periods surrounding activity regarding
10  the relevant data. Information about which user had logged in, whether users share
11  passwords, whether the computer was connected to other computers or networks, and
12  whether the user accessed or used other programs or services in the time period
13  surrounding events with the relevant data can help determine who was sitting at the
14  keyboard.

15          It is often difficult or impossible to determine the identity of the person using the
16  computer when incriminating data has been created, modified, accessed, deleted,
17  printed, copied, uploaded, or downloaded solely by reviewing the incriminating data.
18  Computers generate substantial information about data and about users that generally
19  is not visible to users. Computer-generated data, including registry information,
20  computer logs, user profiles and passwords, web-browsing history, cookies and
21  application and operating system metadata, often provides evidence of who was using
22  the computer at a relevant time. In addition, evidence such as electronic mail, chat
23  sessions, photographs and videos, calendars and address books stored on the computer
24  may identify the user at a particular, relevant time. The manner in which the user has
25  structured and named files, run or accessed particular applications, and created or
26  accessed other, non-incriminating files or documents, may serve to identify a particular
27  user. For example, if an incriminating document is found on the computer but
28  attribution is an issue, other documents or files created around that same time may
29  provide circumstantial evidence of the identity of the user that created the
30  incriminating document.

1        Analyzing data has become increasingly time-consuming as the volume of data

2    stored on a typical computer system and available storage devices has increased. For

3    example, a single megabyte of storage space is roughly equivalent of 500 double-spaced

4    pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly

5    equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being

6    sold for personal computers capable of storing multiple terabytes (thousands of

7    gigabytes) of data. And, this data may be stored in a variety of formats or encrypted

8    (several new commercially available operating systems provide for automatic

9    encryption of data upon shutdown of the computer). The sheer volume of data also has

10   extended the time that it takes to analyze data. Running keyword searches takes longer

11   and results in more hits that must be individually examined for relevance. And, once

12   reviewed, relevant data leads to new keywords and new avenues for identifying data

13   subject to seizure pursuant to the warrant.

14       Based on the foregoing, identifying and extracting data subject to seizure

15   pursuant to this warrant may require a range of data analysis techniques, including

16   hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude

17   certain data from analysis, such as known operating system and application files. The

18   identification and extraction process, accordingly, may take weeks or months. The

19   personnel conducting the identification and extraction of data will complete the analysis

20   within one-hundred twenty (120) days of this warrant, absent further application to this

21   court. All forensic analysis of the imaged data will employ search protocols directed

22   exclusively to the identification and extraction of data within the scope of this warrant.

23

24                                           Paul Geering

25                                           Special Agent

26                                           Internal Revenue Service – Criminal Investigations

27   SUBSCRIBED and SWORN to before me
     this _6_th day of September, 2017 in San Diego, California.

28

29

30   HON. ~~BARBARA L. MAJOR~~
     United States Magistrate Judge

                **ANDREW G. SCHOPLER**
                **U.S. MAGISTRATE JUDGE**

- 13 -

## ATTACHMENT A

1. Cricket Cellular Telephone
   IMEI 014671003980895

2. LG Cellular Telephone
   IMEI 355265081627986

3. Samsung Cellular Telephone
   IMEI 357943060803947 / 357944060803945

4. Motorola Cellular Telephone
   IMEI 351864081304093 / 351864081304101

5. Samsung Cellular Telephone
   IMEI 358765060970726

6. Samsung Cellular Telephone
   IMEI 355637077127280

7. LG Cellular Telephone
   IMEI 35684807844482

8. Apple iPad Tablet
   SN F7RML8BBF196

9. HP 14AN012NR Laptop
   SN 5CG7183TW3

10. Apple iPad Tablet
    SN DLXTK069GMLL

11. Apple A1311 Desktop Computer
    SN QP0080BG5PC

12. Gdrive USB Storage Device
    SN DP1WXBXU

13. LG Cellular Telephone
    IMEI 354873075666190

14. LG Cellular Telephone
    IMEI 014109008493655

15. Apple iPhone
    IMEI 359305061161881

16. Apple iPhone
    Black, Model A1661, serial number inaccessible

## ATTACHMENT B

Authorization to search the electronic devices described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the electronic devices. The search of the electronic devices will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the electronic devices described in Attachment A will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data:

a.  relating to or memorializing the delivery of controlled substances from Mexico to the United States, the importation of a controlled substance, the transportation or distribution of a controlled substance within the United States, and/or the transportation, laundering, or use of drug proceeds, including, but not limited to: phone logs, messages, photos, contact lists, and financial records;

b.  tending to identify other facilities, storage devices, or services- such as email addresses, IP addresses, phone numbers-that may contain electronic evidence as described in item a;

c.  tending to identify co-conspirators, criminal associates, or others involved in the activities described in item a;

d.  tending to identify travel to or presence at locations involved in the activities described in item a;

e.  tending to identify the user of, or persons with control over or access to, the subject electronic devices; or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above

which are evidence of violations of Title 18, United States Code, Sections 922, 924, 1956, and 1957; and Title 21, United States Code, Sections 841 and 846.

The search of the electronic devices shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the electronic devices may be searched for the evidence above.